

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

MARGARET HULL,                          )
                                        )
          Plaintiff,                    )
                                        )     No. 04 C 5129
     v.                                 )
                                        )     Judge John W. Darrah
PAIGE TEMPORARY INC.,                   )
                                        )
          Defendant.                    )

## MEMORANDUM OPINION AND ORDER

Plaintiff, Margaret Hull, filed suit against Defendant, Paige Temporary Inc. ("Paige"), alleging age discrimination, breach of contract, and violation of the Illinois Wage Payment and Collection Act ("IWPCA"). Hull also seeks declaratory relief and an accounting regarding her alleged ownership in Paige. Presently pending before the Court is Paige's Motion for Summary Judgment.

## BACKGROUND

In 1989 Paige became a corporation. The initial stockholders were Karen Rae Horwitz ("Horwitz"), Sidney Horwitz ("Sidney"), Donna Lynn Steinbrecher, and Patricia Whitney. Horwitz initially owned thirty-nine of one hundred shares of Paige, Sidney owned forty-one shares, and Steinbrecher and Whitney each owned ten shares. (Def.'s 56.1(a)(3) Statement ¶ 4). In 1994, Horwitz purchased Whitney's ten shares and, in 1996, purchased Steinbrecher's ten shares. Also in 1996, Sidney relinquished thirty-one shares of his stock to Horwitz. At the end of 1996, Horwitz owned ninety shares of Paige stock, and Sidney owned ten shares of Paige stock. (Id., ¶ 5). No other capital shares of Paige stock were issued or otherwise changed hands after these transactions. (Id., ¶ 6).

Paige dissolved as a corporation in 2003; and its capital assets and employees were transferred to Miss Paige, Ltd. ("Miss Paige"). At the time of the dissolution, Horwitz owned ninety of the one hundred shares of Miss Paige stock; and Sidney owned the remaining ten shares. After 2003, no other capital shares of Miss Paige stock were issued. Horwitz was the President of both Paige and Miss Paige. (Def.'s 56.1(a)(3) Statement ¶ 7). Paige and Miss Paige had separate and distinct functions. Miss Paige provided placement services for those client employers who were seeking to hire applicants as their own direct-hire employees or on a temp-to-hire basis. Paige obtained for its client companies temporary workers as well as employees on a temp-to-hire basis. (Id., ¶ 8).

Paige provided employees with one week of vacation after one year of employment, two weeks of vacation after two years of employment, three weeks of vacation after five years of employment, and four weeks of vacation after ten or more years of employment. Vacation did not accrue from year to year. If an employee did not use vacation time by December 31 of a calendar year, the vacation time was forfeited. (Def.'s 56.1(a)(3) Statement ¶ 163). Paige had a short-term disability plan, which provided qualifying employees with thirteen weeks of salary continuation during a medical leave of absence, which began after an employee was absent from work due to a medical condition for approximately one week. After the thirteen weeks of paid leave under the short-term disability plan expired, an employee was not entitled to additional paid leave unless the employee had remaining vacation time. (Id., ¶ 164). Paige did not maintain a severance plan, and Horwitz had complete discretion whether to offer severance pay to an employee who resigned or was terminated. (Id., ¶ 168).

2

In 2002, Paige employed approximately ten to eleven salaried employees. Paige did not employ more than twenty salaried employees in each of twenty or more calendar weeks in either 2001 or 2002. (Def.'s 56.1(a)(3) Statement ¶ 9). Except for several employees who processed payroll, a salaried employee hired by Paige generally performed work exclusively for Paige, while a salaried employee hired by Miss Paige performed work exclusively for Miss Paige. Two or three employees performed special payroll and bookkeeping functions for both companies. For these special payroll employees that performed work both for Paige and Miss Paige, an internal allocation was made for the distribution of their duties, which, by extension, determined from which company their salary would be derived in whole or in part. (Id., ¶ 10). In 2002, Paige placed approximately 3,000 hourly temporary employees with its clients. (Id., ¶ 11). The hourly temporary employees placed by Paige received paychecks directly from Paige. The work schedule, daily assignments, and the manner in which the temporary employees would perform their work were controlled by the client companies. (Id., ¶ 12). The hourly employees were hired by Paige, fired by Paige, and claimed unemployment benefits from Paige. (Plaint.'s 56.1(b)(3) Statement ¶ 31).

From 1989 through approximately 1997, Paige occasionally awarded discretionary bonuses to its salaried employees. (Def.'s 56.1(a)(3) Statement ¶ 13). In 1994, Horwitz began considering the creation of an executive bonus compensation program for certain key employees in both Paige and Miss Paige. Horwitz's goal in such a program was to retain and reward key employees. (Id., ¶ 14). At first, Horwitz considered awarding actual capital stock shares of Paige and Miss Paige to certain employees. (Id., ¶ 15). Horwitz's accountant, Gerald Frishman, advised Horwitz against awarding employees capital shares of stock because of the federal and state tax implications of such

3

awards. (Id., ¶¶ 16-18). In lieu of offering capital shares of Paige and Miss Paige employees, Frishman advised Horwitz about a concept called a "phantom ownership" or "phantom partnership" (collectively "phantom partnership").

Frishman explained that a phantom partnership was nothing more than an executive bonus compensation program, whereby employees simply received a monetary bonus without obtaining a formal ownership interest in a company. (Def.'s 56.1(a)(3) Statement ¶ 19). He further explained that the term phantom partnership was used to distinguish the bonus program from a formal capital ownership interest in the company. The term phantom partnership was used because the bonus program would be based, to some extent, on the profits of the company. (Id., ¶ 20).

Horwitz first instituted the executive bonus program for Paige and Miss Paige in 1997. Since its inception, the components have not changed. The program was commonly referred to as a phantom partnership by Horwitz and other Paige and Miss Paige employees. (Def.'s 56.1(a)(3) Statement ¶ 21). At the time of the program implementation, there was no written policy or document that summarized the terms of the program. (Id., ¶ 22). Throughout 1997 and 1998, Horwitz, Richard Schuster, and David Pauker (Horwitz's attorney) worked on drafts of a sample written agreement that would summarize the terms of the executive bonus program. Upon advice of her accountant and legal counsel, Horwitz decided not to issue a written policy or agreement to employees participating in the phantom partnership program. (Id., ¶ 23).

The executive bonus compensation program was comprised of three major components: (1) an annual bonus, (2) a potential payout upon employment termination, and (3) a payout if Paige was ever sold. (Def.'s 56.1(a)(3) Statement ¶ 25). In setting up the program, Horwitz assigned a particular percentage number to a particular employee which was used as part of a formula for

4

determining an employee's bonus or payout amount. (Id., ¶ 26). The annual bonus component of the program was always calculated during the second or third week of December of a calendar year. These calculations were based on a preliminary income statement and "peg number." (Id., ¶ 27). The annual bonus component was always paid out before December 31 of a calendar year. The annual bonus payments were treated as ordinary income for the employee recipients and reported on their end-of-year IRS W-2 forms. The annual bonus payments were not reported as capital gains. (Id., ¶ 28). In any given year, Horwitz had the discretion to decide not to pay out annual bonuses pursuant to the program. If the company profits were insufficient in any one given year, Horwitz had the discretion not to pay out any bonuses under the program. (Id., ¶ 29). In 2002, Horwitz exercised her discretion not to pay out annual bonuses to employees participating in the bonus program due to rapidly declining profits for Paige in 2001 and unusually low profits for Paige in 2002. (Id., ¶ 31).

The second component of the program was a potential monetary payout if an employee ever separated from service with Paige. (Def.'s 56.1(a)(3) Statement ¶ 31). When Paige was first established, Frishman helped establish a formula to govern book-value buyouts of capital shareholders. Under that formula, a capital shareholder of Paige would be entitled to a particular percentage of 105 percent of the difference between the book value on the date the individual stopped being a capital shareholder and the book value on the date the individual first began participating in the program. (Id., ¶ 32). For example, if an individual obtained a three-percent capital share of Paige in 1989 and divested his or her three-percent capital share in 1994, the individual would receive 3 percent of 105 percent of the difference between the book value of Paige in 1994 and the book value of Paige in 1989. (Id., ¶ 33). Effectively, if Paige's book value had increased between the date when the individual first became a capital shareholder and the date the

5

individual divested as a capital shareholder, the individual would receive some amount of compensation. (Id., ¶ 35). On the other hand, if Paige's book value decreased during this same time period, the individual would receive no compensation. (Id., ¶ 35). Horwitz borrowed this capital shareholder formula and used it as a model for creating the employment termination payout component of Paige's executive bonus compensation program. (Id., ¶ 36).

In an effort to retain key employees through a potential sale of Paige, Horwitz established the third component of the bonus program. The third component provided that in the event the company was sold to a third-party, each participating key employee would receive his or her respective assigned percentage of the sale value of the company. (Def.'s 56.1(a)(3) Statement ¶ 37).

Hull, who was born in 1947, was hired in 1992 as a branch manager of Paige's Vernon Hills office. In 1993 or 1994, Hull was transferred to Paige's Skokie office as a branch manager. (Def.'s 56.1(a)(3) Statement ¶ 38). In 1999 and 2000, due to an increase in business, Hull essentially became Paige's general manager, replacing an employee who had previously held the position. As a general manager, Hull handled problems, scheduled vacations, and conducted training. (Id., ¶ 39). As part of her general managerial duties, Horwitz expected Hull to supervise Paige's various offices and to ensure that she and her branch managers and subordinate employees were complying with Paige policies. Horwitz expected Hull to visit Paige's various offices and supervise Paige's staff. (Id., ¶ 40). As Hull began taking on additional responsibilities as a general manager, Horwitz began including Hull in meetings with employees who participated in the executive bonus program. (Id., ¶ 42).

Horwitz permitted the following key Paige and Miss Paige employees to participate in the phantom partnership program: Richard Schuster, Executive Vice-President, 5 percent for Paige and

6

five percent for Miss Paige – 5 percent for Miss Paige after Paige dissolution; Kristen Pietrucha, Director of Purchasing, 1 percent for Paige and 1 percent for Miss Paige – 5 percent for Miss Paige after Paige dissolution; Conrad Graff, Vice President, 5 percent for Paige; Pamela Wing, Director of Professional Placement, 2.5 percent for Miss Paige – 5 percent for Miss Paige after Paige dissolution; Nancy Nesti, Vice President, 5 percent for Paige and 5 percent for Miss Paige – 5 percent for Miss Paige after Paige dissolution; Janet O'Malley, Treasurer, 2 percent for Paige; and Hull, 2 percent for Paige. (Def.'s 56.1(a)(3) Statement ¶¶ 43-44). When Paige dissolved, its employees who participated in the executive bonus compensation program transferred to Miss Paige. The employees assigned percentages were also transferred and, in some cases, increased. No key employees of Paige who transferred to Miss Paige had their assigned percentage decreased. (Id., ¶ 45).

Hull's understanding was that she became part of Paige's phantom partnership in 2000. (Def.'s 56.1(a)(3) Statement ¶ 46). As a phantom partner, Hull understood that she was entitled to 2 percent of the profits of Paige; and if Piage was ever sold, she would be entitled to a payout equal to 2 percent of the sale price of the company. (Id., ¶ 47). At the end of the December 1999 meeting, Hull had a discussion with Horwitz about what percentage Hull would be assigned in connection with the phantom partnership. Horwitz passed two pennies and two paperclips to Hull, which Hull understood to signify that her percentage was two. (Id., ¶ 49). The phantom partnership was never explained to Hull, she did not receive any capital stock certificates, she did not sign any partnership agreement, and she did not sign any type of document that acknowledged that she had some type of interest in Paige. (Id., ¶¶ 50-54).

Hull received an annual bonus at the end of 2000 as part of the partnership program. Paige issued an IRS Form W-2 to Hull for the 2000 phantom partnership bonus and for every bonus she received thereafter. Hull reported the income from the bonuses as ordinary income. (Def.'s 56.1(a)(3) Statement ¶ 54). Hull did not have any conversations with other Paige employees who were included in the phantom partnership program about the program. Those other employees also did not receive capital stock or any other legal ownership in Paige, and they reported the income from the bonuses as ordinary income. (Id., ¶¶ 55-60). Hull understood that Schuster, Pietrucha, Wing, O'Malley, Nesti, and Graff were all participants in the phantom partnership program and that as part of the program, they had a percentage stake in the profits at the end of the year. (Id., ¶ 64). Hull assumed that her participation in the phantom partnership program mirrored the others who were involved in the program. (Id., ¶ 65). Horwitz does not believe that she ever had a personal conversation with Hull about the terms of the phantom partnership. Hull testified that in December 2000, she met with Horwitz and that Horwitz stated that Hull had become a phantom partner, stating, "You're going to get two percent of Temp." (Id., ¶ 63; Plaint.'s Response ¶ 63).

Horwitz often mentioned to the employees who participated in the phantom partnership program that they should "think like owners" of Paige or Miss Paige. Her purpose in making this comment was to encourage key employees to perform to the best of their ability because the more they contributed to the profits of the companies, the greater the potential would be to obtain a larger annual bonus. (Def.'s 56.1(a)(3) Statement ¶ 67). It was common knowledge that participants in the phantom partnership were expected to "act like owners." (Id., ¶ 68). Schuster, Pietrucha, Wing, O'Malley, Nesti, and Graff understood that when Horwitz encouraged employees to think and act like owners, she was not implying that they actually had a legal ownership interest in either Paige

8

or Miss Paige. (Id., ¶ 70). These participants understood the phantom partnership to be an executive compensation program that Horwitz established that did not entitle them to a legal ownership interest in the companies. They gained this understanding through attendance at regular meetings with Horwitz and other phantom partnership participants. (Id., ¶ 71).

By 1999, Graff's role at Paige had changed dramatically, such that it was no longer warranted for him to participate in the phantom partnership program. (Def.'s 56.1(a)(3) Statement ¶ 72). During meetings held in 1999, Horwitz, Graff, and the phantom partnership participants calculated Graff's buyout pursuant to the termination formula that was part of the executive compensation bonus program. (Id., ¶ 73). Pursuant to the termination payout formula of the phantom partnership program, Graff received approximately $20,000 in 1999, which he agreed to invest in a new business venture called Skill Trax. Skill Trax ultimately failed as a business venture. (Id., ¶ 74). In 2000, Horwitz felt sorry about Graff's loss of his payout in the failed Skill Trax venture and gave Graff approximately $20,000 as a gift. (Id., ¶ 75). Graff resigned from Paige in 2002; at which time, Horwitz gave Graff a gift of $150,000 for his over-ten years of service to Paige. (Id., ¶ 77). Horwitz's $150,000 gift consisted of two components. First, at Graff's request, Horwitz gave Graff approximately seventeen weeks of salary continuation up through and including September 2002. Second, Horwitz gave Graff the remainder of the $150,000 in a lump sum check. (Id., ¶ 78). Graff understood that he had no legal or contractual entitlement to either the $20,000 or the $150,000 that he received. (Id., ¶ 79).

In 2000, one of Paige's major clients was Verizon Wireless. Verizon had contracted with Paige to hire between eighty and one hundred employees. (Def.'s 56.1(a)(3) Statement ¶ 80). For any employee that Paige placed with Verizon, Verizon required the verification that the employee

9

had a high school diploma, the verification of the employee's last two employment references, and the completion of a criminal background check for the employee. (Id., ¶ 81). The Verizon account was managed out of Paige's Elgin office. Sherry Bridges was the Elgin office branch manager. (Id., ¶ 82). In 2000, Horwitz became aware of evidence that suggested that the Elgin office staff was not properly following Verizon's hiring procedures, including not completing criminal background checks. (Id., ¶ 83). Hull became involved with the Verizon problem in October or November 2000. Hull visited the Elgin office in order to remedy the problem. Hull believed that she had everything in order when she left the Elgin office. (Id., ¶ 84). After Hull left the Elgin office, she told Horwitz, "If there was an audit done now, we are good." After Hull had put the Verizon files together at the Elgin office, Horwitz told her, "You are responsible for this. This is on your shoulders." (Id., ¶ 86).

In December 2000, Verizon rejected many of the temporary employees placed by Paige because the employees failed to meet Verizon's hiring criteria. Paige was unable to charge Verizon for placement services for these non-compliant temporary employees. Because of these errors, Paige lost Verizon as a client, resulting in the loss of a multi-million dollar client and a tarnishing of Paige's reputation. (Def.'s 56.1(a)(3) Statement ¶ 87). Horwitz blamed the loss of the Verizon account on Hull's lack of proper management of the Elgin office. Horwitz contemplated discharging Hull at that time. Instead, because the procedural mistakes involving Verizon resulted in a financial loss for Paige, Horwitz deducted approximately $32,000 from Hull's annual phantom partnership bonus in 2000. The loss of the Verizon account affected the amount of bonuses for all employees in the 2001 calendar year. (Id., ¶ 89). After the Verizon incident, Horwitz told Hull that employees were complaining about Hull's job performance. Horwitz perceived that Paige employees were very

careful when working with Hull to clarify lines of responsibility because employees did not want to become involved in a bigger problem. (Id., ¶ 70).

Paige also had Hewitt Associates as a client. (Def.'s 56.1(a)(3) Statement ¶ 91). In late 2000 or early 2001, Horwitz became aware of another problem concerning the completion of background checks in Paige's Vernon Hills office involving Hewitt. Nicki Bergfeld was the Vernon Hills branch manager at that time. (Id., ¶ 92). Horwitz spoke with Hull in early 2001 about errors in the hiring and placement procedures for Hewitt. In that conversation, Horwitz spoke with Hull about errors that had been made by Bergfeld, which ultimately resulted in a disciplinary suspension of Bergfeld in 2001. These errors cost Paige approximately $11,000 to $16,000. (Id., ¶ 93). Bergfeld resigned from Paige in 2001. Upon her resignation, Bergfeld told Horwitz that Hull knew how Bergfeld was processing applications for Hewitt and that Bergfeld was merely following Hull's "lead" in terms of filling placement orders instead of properly conducting background checks. (Id., ¶ 94).

In early 2001, Paige also witnessed an increase in "no charges," all of which were approved by Hull. "No charges" are occasions when Paige placed a temporary employee with a client and the temporary employee did not perform to the client's expectations. (Def.'s 56.1(a)(3) Statement ¶ 95). Horwitz attributed the increase in no charges to Hull's lack of supervision of Paige employees. (Id., ¶ 96).

Also in early 2001, Paige employees began approaching Horwitz with operational issues and questions. (Def.'s 56.1(a)(3) Statement ¶ 97). These Paige employees included Amy Clark, Brandi Gentile, and Nesti. These employees cited Hull's lack of judgment as a reason for not first approaching Hull. (Id., ¶ 98).

11

In July 2001, Horwitz removed Hull's day-to-day responsibilities as general manager. Horwitz made this decision based, in part, on the Verizon and Hewitt incidents, the increase in no charges, and the hesitation of employees to approach Hull directly with operational questions and issues. (Def.'s 56.1(a)(3) Statement ¶ 99). At that time, Horwitz believed that she needed to take on the role of general manager in order to have an efficiently and effectively functioning company. (Id., ¶ 100).

From March or April 2001 through April 2002, Hull may have used a variety of job titles for her position, which she made up and selected herself. (Def.'s 56.1(a)(3) Statement ¶ 102). During this time, Horwitz received complaints from a number of Paige staff about Hull's use of the job title "managing partner." (Id., ¶ 103). During this time frame, Hull worked in several Paige offices. During her rotation through these offices, Horwitz considered Hull's job title as branch manager. (Id., ¶ 104).

From February 2002 through April 2002, Hull was assigned to work in the Skokie office. The Skokie office was staffed by Kathleen Evans, who was planning to take maternity leave, and Dionna Hunger, who had recently been assigned to the Skokie office. Horwitz did not believe that Hunger had the appropriate skills to handle the Skokie office in Evans' absence. (Def.'s 56.1(a)(3) Statement ¶ 105). Therefore, Horwitz transferred Hull to the Skokie office. Horwitz told Hull that she had the opportunity to "fix up" the Skokie office. She told Hull that this was an opportunity to "redeem" herself in the eyes of her co-workers by exhibiting "good operational skills, good management, good selection of temporaries, keeping revenue solid – by performing well." Hull agreed that the aforementioned concept was "conveyed in many different ways." (Id., ¶ 106).

From April 2002 to October 16, 2002, Hull took a paid medical leave of absence. (Def.'s 56.1(a)(3) Statement ¶ 108). After Hull began her medical leave, Horwitz became aware of several problems in the Skokie office. One problem involved a temporary employee falsifying overtime work on his timecard. There was also another failure to properly conduct a special background check on temporary employees for another client. (Id., ¶ 109).

In May 2002, Horwitz had a meeting with Hull at Hull's house. During that meeting, a variety of topics were discussed. (Def.'s 56.1a(3) Statement ¶ 110). Horwitz spoke about Hull's potential "retirement" from Paige in light of her continuing medical problems. (Id., ¶ 111). Horwitz and Hull discussed how much Hull could receive if she left Paige. The amount discussed was between $150,000 and $200,000. Horwitz was willing to give Hull $150,000 because that was the amount she recently had given Graff. (Id., ¶ 112). At that time, Horwitz had sufficient funds that she could offer Hull a gift like she had given Graff. (Id., ¶ 113). An outline prepared by Horwitz for the meeting stated "retire – 'cash out' now? Hold [cash out] when we sell?" (Plaint.'s 56.1(b)(3) Statement ¶ 20; Def.'s Response Plaint.'s Statement ¶ 20). Hull avers that Horwitz told her at the meeting that Hull could cash out her phantom partnership for between $150,000 and $200,00 or hold her interest if she retired and then cash it in when Paige Temporary was sold. (Id., ¶ 21).

In September 2002, Horwitz had a telephone conversation with Hull. During the conversation, Hull asked how Allison Springer, a new Paige employee, was performing. (Def.'s 56.1(a)(3) Statement ¶ 115). Horwitz told Hull that she believed that Springer was bright, conscientious and eager to learn but that she was weak in the sense of being inexperienced. (Id., ¶ 116). Hull recalled that Horwitz stated that she "wanted to build a new company with people like Allison [Springer], and that she was going to build her company on sturdy, young legs." (Id., ¶ 117).

13

Horwitz did not mention age during the conversation. (Id., ¶ 118). Although Horwitz had mentioned Hull's age at other times prior to this conversation, Hull did not construe any of Horwitz's age comments as being related to age discrimination. (Id., ¶ 120). Hull did not know what Horwitz meant by a "new company" and did not seek any clarification. (Id., ¶ 119).

During her 2002 medical leave of absence, Hull took advantage of the thirteen weeks of salary continuation pursuant to the short-term medical disability plan. Hull's benefits under the short-term disability plan were exhausted in August 2002. (Def.'s 56.1(a)(3) Statement ¶ 165). After the exhaustion of the short-term disability plan, Paige continued to pay Hull her full salary until her return in October 2002 by applying Hull's vacation time. Paige applied one week of Hull's vacation time to cover Hull's initial week of absence in April 2002 and the remaining three weeks to cover Hull's absence from August through September 2002. (Id., ¶¶ 166-67).

On October 16, 2002, Hull returned from her medical leave. Hull attended a regularly scheduled staff meeting, during which Horwitz explained to the staff that she would keep Hull "on a short leash." (Def.'s 56.1(a)(3) Statement ¶ 122). Hull was assigned to serve as branch manager of the Skokie office. (Id., ¶ 123). As branch manager, Horwitz expected Hull to supervise the other office employees, including discovering any mistakes, correcting the mistakes, and training those employees not to make those mistakes again. (Id., ¶ 124).

After Hull's assignment to the Skokie office, a client from that office complained about the quality and skills of a temporary employee placed by Paige. As a result, the temporary employee was sent home, and Paige could not charge the client for the placement. (Def.'s 56.1(a)(3) Statement ¶ 127). Several days later, the same client complained about another temporary employee who had been placed without having employment references checked. (Id., ¶ 128).

14

On November 22, 2002, Nesti visited the Skokie office to meet with Horwitz. She had not been called to the Skokie office to help Hull. (Def.'s 56.1(a)(3) Statement ¶ 129). While waiting to meet with Horwitz, Nesti began to help file some temporary employee paperwork that had been processed under Hull's supervision of the Skokie office. After examining several of the files, Nesti realized that background and/or employment checks had not been completed on at least two candidates who had already been placed. (Id., ¶ 130). Nesti informed Horwitz of her findings. Nesti had previously shared with Horwitz her concern of placing Hull in the Skokie office. (Id., ¶ 132). Horwitz told Nesti to call Hull and Whitney into Horwitz's office. (Id., ¶ 134).

During the meeting, Nesti recounted how she discovered the employees that had been improperly placed. (Def.'s 56.1(a)(3) Statement ¶ 134). Horwitz left the meeting at one point, during which time a conversation ensued between Hull, Nesti, and Whitney. During this conversation, Nesti suggested that Hull should consider resigning. Whitney suggested that if anything like this should happen again, Hull should be fired. (Id., ¶ 135). Horwitz informed Hull that Horwitz had lost credibility with her partners by bringing Hull back and Hull's not performing to Paige's standards. (Id., ¶ 136). Horwitz decided to suspend Hull without pay for one week. (Id., ¶ 137). After telling Hull of the suspension, Horwitz told Hull that she still had not made a final decision about Hull's future with Paige. Hull interpreted this comment to mean that she would be terminated for the latest incident. (Id., ¶ 138).

After Hull's suspension, Horwitz was 50 percent certain that she would ultimately have to terminate Hull for her poor performance and continued poor judgment. (Def.'s 56.1(a)(3) Statement ¶ 139). Horwitz did not consider it relevant whether it was Springer or Hull who actually failed to perform the background checks because Horwitz had appointed Hull to supervise the Skokie office;

15

therefore, Hull was responsible for the errors. (Id., ¶ 14). Hull believes that Springer misled Hull into believing that the background checks had been completed and kept the files out of plain sight so that Hull would not find the files. (Plaint.'s 56.1(b)(3) Statement ¶ 40). Springer did not receive any discipline for failing to conduct the background checks. (Id., ¶ 42).

After Horwitz announced Hull's suspension, she spoke with Springer and informed her about the errors that were discovered and that Nesti would be supervising the office during Hull's absence. (Def.'s 56.1(a)(3) Statement ¶ 142). Horwitz also made Springer part of an overall audit of the Skokie office files in an attempt to locate any other errors and/or violations of company policy. (Id., ¶ 143).

On December 27, 2002, the first day that Horwitz returned to work after a vacation, she decided to terminate Hull's employment. (Def.'s 56.1(a)(3) Statement ¶ 146). Horwitz decided to terminate Hull based on Hull's past poor performance and continued poor judgment exhibited in supervising Paige offices. In addition, Horwitz had lost credibility with other Paige employees because Horwitz had returned Hull to work at Paige over many objections of Paige employees. (Id., ¶ 147). Prior to terminating Hull, Horwitz contacted her accountant and asked him to verify that Hull was not entitled to receive any book value payout pursuant to the terms of the phantom partnership program. (Id., ¶ 148). Horwitz's accountant indicated that the book value of Paige in 2002 was less than it was in 2000; therefore, Hull was not entitled to any book value payout under the phantom partnership program. (Id., ¶ 150). The book value of Paige was lower than it was in 2000 due to a radical downturn in the number of work orders received from Paige's clients. (Id., ¶ 149).

Although Hull was not entitled to receive a book value payout, Horwitz wished to give Hull a sum of money in consideration for Hull's approximately ten years of service with Paige, similar to the gift Horwitz had given to Graff earlier in 2002. (Def.'s 56.1(a)(3) Statement ¶ 151). Horwitz instructed O'Malley to cut two checks made payable to Hull: one in the gross amount of $150,000 and a second check consisting of ten weeks of severance pay. Horwitz had no prior conversation with O'Malley about the checks and wanted to present the checks to Hull on December 27, 2002. (Id., ¶ 152). O'Malley wrote the phrase "phantom partner buyout" on the check for $150,000. O'Malley made this notation as a bookkeeping reminder for herself so that when the check was deducted from Paige's finances, it would be deducted from "below the line" – after employee executive bonuses were deducted. Horwitz did not tell O'Malley to write "phantom partnership buyout" on the check. (Id., ¶ 153). Paige's payroll system did not have a special code for executive bonus payments. As a result, journal entries had to be made by hand in order to ensure that executive bonus payments were made "below the line." If Hull's payment was deducted from "above the line," the bonuses for employees and phantom partners would be reduced since the overall profits would be reduced. (Id., ¶ 154).

In order to save Hull the embarrassment of being terminated in the office, Horwitz walked Hull to her car on December 27, 2002. Horwitz told Hull that she had good and bad news. (Def.'s 56.1(a)(3) Statement ¶ 155). Horwitz told Hull that the bad news was that Hull could not work at Paige anymore and that Horwitz was giving Hull the option of resigning in lieu of termination. Horwitz also gave Hull the two checks. (Id., ¶ 156). At no time during the conversation did Horwitz tell Hull that she was going to be terminated because of her age. (Id., ¶¶ 157, 159). After the conversation, Hull hugged Horwitz. (Id., ¶ 158).

After Hull's termination, Nesti was assigned to the Skokie office as acting branch manager to supervise Springer. (Def.'s 56.1(a)(3) Statement ¶ 160). In 2003, Springer was terminated because she was not meeting Horwitz's performance expectations. (Id., ¶ 162).

In January 2003, Hull wrote to Horwitz, asking how Horwitz arrived at the value of the two-percent ownership in Paige and the ten weeks of severance payment. (Plaint.'s 56.1(b)(3) Statement ¶ 25). Horwitz wrote Hull that the $150,000 was just "a gift" and that Hull was not entitled to any cash payment for her phantom partnership. Horwitz also wrote that Hull would have been entitled to a payout for her phantom stock if Paige had been sold to an outside party or to a buy out if the book value of Paige had been up between 2000 and 2002. (Id., ¶ 26).

In March 2003, Paige Temporary's counsel wrote to Hull's counsel, stating that:

> Ms. Hull, among other key employees, participated in an executive compensation plan, the terms of which were explicit and well known to your client. There were three components to that plan. First, she was entitled, commencing January 1, 2000, to receive in December of that Calendar year, and for the following calendar years where applicable, an amount equal to 2% of the net profit of Paige Temporary, Inc. only . . . . Second, at the termination of employment, Ms. Hull was entitled to receive 105% of the difference between the book value of Paige Temporary, Inc. as of her termination date and the book value of Paige Temporary, Inc. on December 31, 1999, when she became an eligible employee under the plan . . . . Third, in the event that Paige Temporary, Inc. was sold, Ms. Hull would have been entitled to receive at closing, a sum equal to 2% of the sales price.

A follow-up letter was sent to Hull's counsel, explaining an inadvertent omission in the March 2003 letter. The follow-up letter explained that the previous letter should have read *2 percent* of 105

18

percent of the difference between the book value of Paige as of her termination date and the book value of Paige on December 31, 1999, when she became an eligible key employee under the plan. (Plaint.'s 56.1(b)(3) Statement ¶ 27; Def.'s Response ¶ 27) (Emphasis added).

## ANALYSIS

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). All the evidence and the reasonable inferences that may be drawn from the evidence are viewed in the light most favorable to the nonmovant. *Miller v. American Family Mutual Ins. Co.*, 203 F.3d 997, 1003 (7th Cir. 2000). Summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Defendant first argues that Hull's age discrimination should be dismissed because Paige was not an "employer" under the Age Discrimination in Employment Act ("ADEA").

A defendant must be an "employer," as defined in the ADEA, for a federal court to have subject matter jurisdiction of a claim brought under the Act. *See* 29 U.S.C. § 630(b); *Rogers v. Sugar Tree Prod.*, 7 F.3d 577, 579 (7th Cir. 1993). The ADEA defines "employer" as "a person engaged in an industry affecting commerce who has twenty or more employees for each working day in each of twenty or more calendar weeks in the current or proceeding calendar years." 29 U.S.C. § 630(b). Although the definition of an "employer" under Title VII and the ADEA is broader

than it is under common law, the court must still look to common law agency principles to determine if the defendant is an "employer." *See Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322-323 (1992).

Five factors are examined in determining whether the defendant is an "employer": (1) the extent of the employer's control and supervision over the worker, including directions on scheduling and performance of work; (2) the type of occupation and the nature of the skills required, including whether such skills are obtained in the workplace; (3) the responsibility for the costs of operation, such as equipment, supplies, licenses, fees, and maintenance of operations; (4) method and form of payments and benefits; and (5) the length of job commitment and/or expectations. *See Mazzei v. Rock-N-Round Trucking, Inc.*, 246 F.3d 956, 963 (7th Cir. 2001) (*Mazzei*). Of these five factors, the employer's right to control the manner and means of the worker's performance is the most important. *See Mazzei*, 246 F.3d at 963.

Hull contends that the 3,000 hourly temporary employees placed by Paige to its clients constitute employees of Paige; therefore, Paige is an employer under the ADEA. The hourly employees were hired by Paige, fired by Paige, and claimed unemployment benefits from Paige. The hourly employees also received their paychecks and any unemployment benefits from Paige. Paige was also involved in determining which hourly employees were assigned to specific job assignments. These facts evidence an "employer" relationship. However, the work scheduled, daily assignments, and the manner in which the temporary employees would perform their work were controlled by the client companies, not Paige.

The above facts demonstrate that Paige exercised *some* control over the terms and conditions of the hourly temporary employees. Whether the amount of control created a employer-employee

20

relationship under the ADEA cannot be determined under the facts presently before the Court. Hull has raised a genuine issue of material fact as to whether Paige is an employer for purposes of the ADEA. *See Magnuson v. Peak Technical Serv., Inc.*, 808 F. Supp. 500, 510 (E.D. Vir. 1992) (genuine issue of material fact existed whether defendant exercised substantial control to be considered an employer under Title VII). Accordingly, summary judgment on this issue is denied.

The ADEA makes it unlawful to "discharge any individual or otherwise discriminate against any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000). Under the *McDonnell Douglas* burden-shifting test, the plaintiff must first establish a *prima facie* case by the preponderance of the evidence. *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 982 (7th Cir. 1999) (*Jackson*). The plaintiff must show that his age was a determining factor in the employer's decision. *See Adreani v. First Colonial Bankshares Corp.*, 154 F.3d 389, 393 (7th Cir. 1998). The plaintiff must establish that: (1) she was in a protected class (40 years of age or older (29 U.S.C. § 631(a)); (2) she performed her job duties such that she was meeting her employer's legitimate expectations; (3) despite her performance, she suffered an adverse employment action; and (4) the position remained open or she was replaced by someone substantially younger. *See Grosjean v. First Energy Corp.* 349 F.3d 332, 335 (7th Cir. 2003) (*Grosjean*).

The undisputed facts demonstrate that Hull was in the protected class, she suffered an adverse employment action, and that her position was filled with someone substantially younger (Nesti is sixteen years younger than Hull). *See Grosjean*, 349 F.3d at 336 (generally, age differences of ten or more years sufficient to establish fourth factor).

Paige seeks summary judgment on Hull's discrimination claim, arguing that she was not meeting her employer's legitimate expectations.

The undisputed facts demonstrate that Horwitz had spoken with Hull about issues relating to properly screening the hourly employees before placing such employees with clients. In 2000, Hull's bonus was reduced by approximately $32,000 because of such an error. In early 2001, Horwitz became aware that employees were not approaching Hull because the employees believed Hull lacked good judgment. In July 2001, Hull's day-to-day responsibilities as general manger were removed. While these incidents occurred well before Hull's termination, they include incidents about which Hull was spoken and which later reoccurred prior to her termination.

Following her return from medical leave, Hull was assigned to the Skokie office as a branch manager. As the branch manager, Hull was responsible for supervising the subordinate employees. Following her assignment to the Skokie office, a client complained about the hourly employee provided by Paige, and Paige was unable to bill the client for that hourly employee. Several days later, the same client complained about an hourly employee being placed with the client without having employment references checked.

The month after Hull's return, it was discovered that at least two hourly employees were placed with clients even though their background and/or employment checks had not been completed. During a meeting with Hull and Horwitz, Horwitz told Hull that Horwitz was losing credibility with her partners for bringing Hull back and Hull's not performing to standards. Hull was suspended for a week based on these incidents. After Hull returned to work and Horwitz returned from a vacation, Horwitz decided to terminate Hull based on Hull's past poor performance and continued poor judgment exhibited by Hull in her supervision of Paige's offices.

22

The above undisputed facts demonstrate that Hull was not meeting Paige's legitimate expectations. Hull argues that Horwitz's admission that she was not going to fire her in May 2002 evidence that she was meeting Paige's expectations. However, Horwitz's admission that she did not plan on terminating Hull in May 2002 does not evidence that Hull was meeting Paige's legitimate expectations in October 2002 through December 2002. After Hull's return, additional incidents reoccurred that would not have been known to Horwitz in May 2002. Hull also argues that the November incident only occurred because of Springer, and the incident should not be attributed to Hull. However, as Springer's supervisor, Horwitz expected Hull to make sure that such incidents did not occur. Based on the above, Hull has failed to establish that she was meeting Paige's legitimate expectations.

Even if Hull was able to establish a *prima facie* case of age discrimination pursuant to the *McDonnell Douglas* test stated above, she has failed to demonstrate that the alleged reasons for her termination were a pretext to discrimination.

If the plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. If the defendant can do so, the burden shifts back to the plaintiff to show that the defendant's proffered reason for its actions is a pretext for discrimination. *See Steinhauer v. Degolier*, 359 F.3d 481, 484 (7th Cir. 2004). A plaintiff can establish pretext by showing that the employer's explanation is unworthy of credence or that a discriminatory reason more likely motivated the employer. *Debs v. Northeastern Illinois Univ.*, 153 F.3d 390, 395 (7th Cir. 1998) (*Debs*). Pretext in this context does not mean a mistake; rather, it means "a lie, specifically a phony reason for some action." *Russell v. Acme-Evans*

23

*Co.*, 51 F.3d 64, 68 (7th Cir 1995). An honest belief in the nondiscriminatory reason offered by the decision-maker will be sufficient even if the reasons are foolish, trivial, or even baseless. *Debs*, 153 F.3d at 396.

Hull argues that Horwitz and Hull's September 2002 telephone conversation in which Horwitz stated that she "wanted to build a new company with people like Allison [Springer], and that she was going to build her company on sturdy, young legs," evidences that the purported reasons for her termination were a pretext to discrimination.

Derogatory comments do not evidence pretext to discrimination unless they are both proximate and related to the employment decision. *See Bahl v. Royal Indem. Co.*, 115 F.3d 1283, 1293 (7th Cir. 1997). Stray remarks unrelated to the alleged discriminatory decision are not sufficient to establish an inference of discrimination. See *Schreiner v. Caterpillar, Inc.*, 250 F.3d 1096, 1099 (7th Cir. 2001).

Here, Horwitz's comment was made three months prior to Hull's termination, when Horwitz was not considering terminating Hull's employment. Furthermore, Hull did not know what Horwitz even meant by the phrase "new company." The single comment is insufficient to raise an inference of pretext. *See Schaffner v. Glencoe Park Dist.*, 256 F.3d 616, 622-23 (7th Cir. 2001) (comments that employee "shows lack of enthusiasm for job, not very energetic"; "seems very settled in job and sometimes unwilling to continue growing with the program"; and "Sharp car. You must have bought it to match your hair" were insufficient to support inference of pretext); *Fortier v. Ameritech Mobile Comm., Inc.*, 161 F.3d 1106, 1113 (7th Cir. 1998) (statements such as needing "new blood" or an employee with "a lot of energy," standing alone, insufficient to raise an inference of discrimination); *Schuster v. Lucent Tech.*, 327 F.3d 569, 576 (7th Cir. 1998) (discussion of "mature people" and the

24

work ethic of younger employees constituted stray remarks and not evidence of pretext); *Fuka v. Thomas Consumer Electronics*, 82 F.3d 1397, 1403-04 (7th Cir. 1996) (comments about discrimination in hiring may not suffice if the case involves a discharge).

Hull also argues that Horwitz's "refusal" to discipline Springer, who was the employee actually responsible for the November 2002 incident, evidences a pretext to discrimination. However, Horwitz's decision not to discipline Springer does not evidence that Horwitz's decision to terminate Hull was a pretext to discrimination. Hull does not dispute that Horwitz believed that as Springer's superior, Hull was ultimately responsible for any mishaps that happened at the location under her management. Hull and Springer are not similarly situated employees. *See Connolly v. Ala Carte Entertainment, Inc.*, No 02 C 0492, 2002 WL 31248497 (N.D. Ill. 2002) ("supervisors and superiors are not similarly situated to subordinates"). Furthermore, Hull fails to present any evidence that Springer was previously involved in similar incidents and had previously received discipline for the same type of incidents as did Hull. Accordingly, the failure to discipline Springer does not evidence that Horwitz's stated reasons for terminating Hull were a lie or a pretense.

Based on the above, Paige's Motion for Summary Judgment as to Hull's ADEA claim is granted.

Paige also seeks summary judgment as to Hull's breach of contract claim, arguing that Hull has failed to establish the creation of a contract whereby she gained an ownership interest in Paige. Hull argues that the phantom partnership constituted an oral contract between Paige and Hull and provided Hull with a two-percent ownership stake in Paige. Furthermore, the $150,000 given to Hull when she was terminated was not equal to 2 percent of the fair value of Paige.

To establish a breach of contract claim under Illinois law, Hull must come forward with evidence of (1) the existence of a contract, (2) her performance under the contract, (3) Paige's breach of the contract, and (4) resulting damages from the breach. *See Burrell v. City of Mattoon*, 378 F.3d 642, 651 (7th Cir. 2004). To establish the existence of a contract, Hull must come forward with evidence of an offer, acceptance, and consideration. *See Valenti v. Qualex, Inc.*, 970 F.2d 363, 366 (7th Cir. 1992) (*Valenti*). Furthermore, to be enforceable, the contract must have been sufficiently definite and certain so that the terms of the contract can be determined or implied. *See Valenti*, 970 F.2d at 366; *Bloomington Partners, LLC v. City of Bloomington, Illinois*, 364 F. Supp. 2d 772, 779 (N.D. Ill. 2005).

Because oral employment contracts are viewed with more skepticism than written contracts, a plaintiff must establish that the offer was clear and definite. *See Kiddy-Brown v. Blagojevich*, 408 F.3d 346, 363 (7th Cir. 2005). A contract is deemed unenforceable for indefiniteness if it leaves out a crucial term that a court cannot reasonably be asked to supply in the name of interpretation. *See Haslund v. Simon Property Group, Inc.*, 378 F.3d 653, 655 (7th Cir. 2004). The determination of whether the parties intended to be bound by the alleged contract is determined by the objective evidence of their intent to the contract in question, not the parties' subjective intent. *See Cohen Dev. Co. v. JMJ Properties, Inc.*, 317 F.3d 729, 735 (7th Cir. 2003).

Hull contends that based on Horwitz's statement "You're going to get two percent of Temp," Hull received a two-percent equity share of Paige; and upon her termination, she was entitled to 2 percent of the fair market value of Paige. Paige contends that no enforceable contract was made giving Hull a 2 percent equity share in Paige.

The undisputed facts establish that Horwitz instituted a phantom partnership program and that Hull became part of that program in 2000. Furthermore, it is undisputed that the phantom partnership consisted of three major components: an annual bonus, a "payout" upon employment termination, and a payout if Paige was sold. In addition, Paige performed under the phantom partnership program as evidenced by Hull's receipt of a bonus in 2000 and Horwitz's discussion with Hull about what she might expect to receive if Paige was sold. Accordingly, a contract existed between Hull and Paige. Furthermore, Horwitz determined whether Hull was entitled to a payout under the second component of the contract, demonstrating Horwitz's intent to be bound by that contract.

The disputed aspect of the phantom partnership program (contract) concerns the potential payout upon employment termination – Hull's contention that she is entitled to 2 percent of the value of Paige under the second component of the phantom partnership and Paige's position that Hull was not entitled to any payout at the time of her termination based on its formula for determining a payout under the second component of the phantom partnership. Specifically, under the second component of the program, a capital shareholder of Paige would be entitled to a particular percentage of 105 percent of the difference between the book value on the date the individual stopped being a capital shareholder and the book value on the date the individual first began participating in the program. Hull was not entitled to any book value payout under the phantom partnership program because the book value of Paige in 2002 was less than it was in 2000 due to a downturn in the number of work orders received from Paige's clients.

No aspect of the phantom partnership program was ever put into writing, and it is undisputed that the phantom partnership program was never explained to Hull (or any other participant).

27

Accepting Hull's statement that Horwitz stated she was "going to get two percent of Temp" as true, that statement constitutes the only terms of the contract. No other discussions or explanations of the phantom partnership program were ever put into writing or discussed. The statement does not indicate what type of interest was created or how that interest would be calculated. Hull interprets the statement as providing a two-percent ownership in Paige that is calculated by the value of Paige at the time of termination. Hull seeks to have the Court supply, in the name of interpretation, these crucial terms of the contract in order to make the contract definite and enforceable. However, Hull presents no evidence to support such an interpretation except for her own subjective beliefs. Based on the undisputed facts before the Court, the phantom partnership program is unenforceable for indefiniteness.

Hull also brought claims under the IWPCA for the wages due and owing for the two-percent ownership buyout and accrued vacation pay.

A prerequisite to maintaining a claim under the IWPCA is proof that the employee had a contract or agreement which entitled the employee to compensation. *See* 820 ILCS 115/2. As stated above, Hull is not entitled to the two-percent buyout. As to compensation for accrued vacation pay, Hull concedes that she received four weeks of vacation pay during her medical leave. Accordingly, Hull's IWPCA claims fail.

## CONCLUSION

For the foregoing reasons, Paige's Motion for Summary Judgment is granted.

Dated November 16, 2005

JOHN W. DARRAH
United States District Judge

28